**Exhibit A**

# THOMPSON HINE

January 30, 2002

*Via Facsimile and U.S. Mail*

A. Christopher Young, Esq.
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103-2799

RE: *ALSTOM Power, Inc., v. BDP International, Inc.*, U.S. District Court for the District of Connecticut
   Case No. 301CV02265 (WWE)

Dear Chris:

In December 2001 you informed me that BDP International, Inc. ("BDP") is willing to resolve the above-entitled action through arbitration, based upon the existence of a Preferred Supplier Agreement, dated June 3, 1998, which you have supplied to me and which you stated was entered between BDP and ALSTOM Power Inc.'s ("ALSTOM") predecessor, ABB Asea Brown Boveri. ALSTOM agrees to arbitration of its dispute with BDP based upon the following terms and conditions:

1. ALSTOM and BDP (the "parties") shall pursue arbitration, as opposed to mediation or any other form of alternative dispute resolution.

2. The results of the arbitration between the parties shall be binding and enforceable.

3. The parties agree that the June 3, 1998 Preferred Supplier Agreement between ALSTOM's predecessor, ABB ASEA Brown Boveri, and BDP is valid, enforceable and complete, and BDP will not seek to challenge the Agreement's validity, enforceability, or completeness of the terms and conditions of the Agreement in the arbitration proceeding between the parties. Notwithstanding the foregoing and the language of Paragraph 4 herein, neither party shall be prevented from raising any defense concerning the Agreement's applicability and enforceability to any transaction involving ALSTOM and BDP for the Paiton Power Project or from presenting evidence of terms which may supplement the Agreement. In such a case, neither party shall be precluded from raising any defense to a defense raised by the other party.

4. BDP agrees that the Preferred Supplier Agreement applied to ALSTOM's shipments moving to Indonesia for the Paiton Power Project.

5. The law applicable to the issues raised in the arbitration shall be the law of the state of New York, as provided for in Article 23 of the Preferred Supplier Agreement.

6. In lieu of filing an Answer to the complaint, the parties shall file a stipulation with the court requesting that the action commenced by ALSTOM against BDP in the U.S. District Court for the District of Connecticut (Case No. 301CV2265 (WWE)) be (i) referred by the Court for

Karyn.Booth@ThompsonHine.com  Phone 202.263.4108  Fax 202.331.8330                JLN 130509 3

THOMPSON HINE LLP        1920 N Street, N.W.       www.ThompsonHine.com
                         Suite 800                Fax 202.331.8330
                         Washington, D.C. 20036-1600   Phone 202.331.8800

JAN 31 2002 1:48 PM FR    TO *01685*049757000 P.03
JAN-30-2002 WED 01:13 PM    Case 3:01-cv-02265-WWE Document 22-2    Filed 01/28/2004    Page 3 of 32

JAN 30 2002 11:36 FR    JMPSON HINE LLP    Y    TO *    55*049757000 P.03/03

# THOMPSON HINE

January 30, 2002
Page 2

arbitration in accordance with the Preferred Supplier Agreement and (ii) stayed pending conclusion of the arbitral proceedings.

7. Any award of the arbitration panel shall be enforced or vacated only in the U.S. District Court for the District of Connecticut, pursuant to the standards of 9 U.S.C. §§ 9 and 10.

8. The parties will enter into good faith negotiations to agree upon procedures to govern the arbitration, including but not limited to the number of arbitrators, discovery, and the schedule for the arbitration proceeding.

9. Notwithstanding the incorporation of the ICC Rules of Arbitration in Article 23 of the Preferred Supplier Agreement, which may require a different venue for the arbitration, the parties agree to conduct the arbitration in the United States.

Please feel free to contact me with any questions you may have regarding the foregoing proposed terms and conditions. If the foregoing are acceptable to BDP, please countersign this proposal at the place indicated below for your signature and return the original letter to the undersigned.

Very truly yours,

Karyn A. Booth

A. Christopher Young, Esq.
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103-2799

On behalf of BDP International, Inc.

cc:    Tom Kehoe, Esq.
       Ron Cohen, Esq.

## CERTIFICATE OF SERVICE

This is to certify that a copy of this Motion by Consent and Exhibit A was sent by first class mail to the following:

A. Christopher Young, Esq.
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

Matthew Den Ouden
O'Connell, Flaherty & Attmore, LLC
280 Trumbull Street
Hartford, CT 06103-3598

Karyn A. Booth
THOMPSON HINE LLP
1920 N Street, N.W
Suite 800
Washington, D.C. 20036

on this 3|th day of January, 2002.

Timothy P. Jensen

**Exhibit B**

## AGREEMENT CONCERNING ARBITRATION PROCEDURES

This Agreement Concerning Arbitration Procedures is made and entered by and between ALSTOM Power, Inc. ("ALSTOM"), a Delaware corporation, and BDP International, Inc. ("BDP"), a Pennsylvania corporation.

WHEREAS, on December 4, 2001, ALSTOM filed a complaint against BDP in the U.S. District Court for the District of Connecticut, Case No. 301CV02265(WWE);

WHEREAS, ALSTOM and BDP have agreed to arbitrate the claims raised in ALSTOM's complaint, and any other claims to be raised in ALSTOM's Arbitration Demand, based upon the existence of a Preferred Supplier Agreement, dated June 3, 1998, entered into between the parties, which requires arbitration of disputes arising under that Agreement and based upon the parties' letter agreement, dated January 30, 2002, which set forth certain arbitration conditions;

WHEREAS, ALSTOM and BDP desire to establish the procedures to govern the arbitration of ALSTOM's claims as more fully described in this Agreement;

NOW THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties agree as follows:

1. <u>Rules of Arbitration</u>. The rules and procedures for the arbitration shall be determined by the terms of this Agreement. If the parties are unable to agree upon a specific rule or procedure, the parties shall seek to resolve the disagreement based upon application of the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), provided, however, that the AAA will not be involved in administering the arbitration, except to the extent that it may be required to serve as the default selector of party appointed and/or the neutral arbitrator as provided hereunder.

2. <u>Number of Arbitrators</u>. The arbitration shall be conducted before a panel of three arbitrators.

3. <u>Arbitration Demand and Reply</u>. ALSTOM shall serve its Arbitration Demand upon BDP within ten (10) days of the final execution of this Agreement by counsel for BDP and ALSTOM. BDP shall serve its Reply to ALSTOM's Demand within twenty (20) days thereafter.

4. <u>Selection of Arbitrators</u>.

      A. <u>Party-Appointed Arbitrators</u>. ALSTOM and BDP shall each select a single arbitrator as its "party-appointed arbitrator" within fifteen (15) days after BDP serves its Reply to ALSTOM's Demand for Arbitration. If a party fails to appoint an arbitrator within such time period, the other party shall apply to the AAA for appointment of such arbitrator from the AAA's National Panel of Commercial Arbitrators. The party that fails to timely appoint an arbitrator shall bear the expenses owed to the AAA for the purpose of appointment of an arbitrator.

B. Selection of the Neutral Arbitrator. The neutral arbitrator shall be selected jointly by the party-appointed arbitrators within forty-five (45) days of their appointment. The neutral arbitrator shall be selected from the CPR U.S. Regional Panels of Distinguished Neutrals, in accordance with the Agreed Procedures for Selecting Neutral Arbitrators, attached hereto as Attachment A. Except as otherwise may be agreed to by the parties, if the party-appointed arbitrators fail to appoint the neutral arbitrator within the forty-five (45) day time period, the parties shall apply to the AAA for appointment of such arbitrator from the AAA's National Panel of Commercial Arbitrators. The parties shall bear equally the expenses owed to the AAA for the purpose of appointment of the neutral arbitrator. The neutral arbitrator shall serve as Chairperson of the Panel.

5. Ethical Requirements for Arbitrators. The arbitrators shall conduct themselves in accordance with the AAA "Code of Ethics for Arbitrators In Commercial Disputes," as modified by this Agreement. The party-appointed arbitrators shall be governed by and shall each execute the Statement of Ethical Considerations Relating to Arbitrators Appointed by One Party, attached hereto as Attachment B. The Statement is based on Cannon VII of the American Arbitration Association's Code of Ethics for Arbitrators in Commercial Disputes. Upon appointment of the neutral arbitrator, the parties shall cease all *ex parte* communications with any arbitrator, including the party-appointed arbitrators.

6. Arbitration Costs. Each party shall be responsible for its own costs associated with the arbitration, including expenses relating to its counsel and witnesses, except that (a) the compensation of all three arbitrators shall be divided evenly between the parties from the date of the appointment of the neutral arbitrator forward and prior to that time each party shall pay any compensation owed to the party-appointed arbitrator that it selected; and (b) the expenses associated with the conduct of hearings shall be shared equally by the parties.

7. Location of Arbitration. The parties have agreed to arbitrate their dispute in [Washington, D.C. or the State of New York], subject to the approval of such location by the Panel. The site of the arbitration shall be determined by the parties and, if the parties cannot agree, by the Chairperson of the Panel.

8. Discovery. The parties may engage in any and all means of discovery authorized under the Federal Rules of Civil Procedure as soon as BDP serves its Reply to ALSTOM's Arbitration Demand, subject to any limitations on the amount and scope of discovery which may be established at the Preliminary Hearing.

9. Preliminary Hearing. Within twenty-five (25) days after the appointment of the neutral arbitrator, the parties shall request a preliminary hearing to be held before the Panel at a place to be agreed upon by the parties, and if the parties cannot agree, at a place designated by the Chairperson, to address procedural matters related to the conduct of the arbitration, including discovery. The Preliminary Hearing shall be held within ten (10) days of the request for the hearing.

10. Rules of Evidence. The rules of evidence for the arbitration shall be governed by R-33 and R-34 of the AAA Arbitration Procedures.

2

11.  Arbitration Decision.  The parties agree that the decision of the arbitrators shall be provided in writing no later than ninety (90) days from the close of the oral hearing or the filing of post-hearing briefs, whichever is later.  The arbitration decision shall be binding on the parties.  A party may seek to enforce or vacate the arbitration decision only in the U.S. District Court for the District of Connecticut, pursuant to the standards of the Federal Arbitration Act set forth at 9 U.S.C. §§ 9 and 10.

12. Governing Law.  The law applicable to the issues raised in the arbitration shall be the law of the State of New York.

Nicholas J. DiMichael
Karyn A. Booth
THOMPSON HINE LLP
1920 N Street, N.W.
Suite 800
Washington, D.C. 20036

*Counsel for ALSTOM Power, Inc.*

A. Christopher Young
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103

*Counsel for BDP International, Inc.*

3

## ATTACHMENT A

## PROCEDURES FOR SELECTING NEUTRAL ARBITRATOR

1.    The neutral arbitrator will be selected from the current CPR U.S. Regional Panels of Distinguished Neutrals ("CPR Regional Panels") found on CPR's website at www.cpradr.org. A period of 45 days from the date of designation of the party-appointed arbitrators will be allowed for selection of the neutral arbitrator.

2.    Without contacting any of the potential candidates, each side will initially designate 15 names from the candidates listed in the region of New York as set forth in the CPR Regional Panels whom it deems potentially acceptable to serve as neutral arbitrator.

3.    If the initial designations result in 3 or more common names, the parties, acting through their party-appointed arbitrators, will proceed to step 4. If there are 2 or fewer common names, each party will designate 7 additional names from the CPR Regional Panels. Those additional names will be added to the original 15 designated for purposes of determining overlaps. This process will be repeated until there are 3 or more common names.

4.    The party appointed arbitrators will jointly interview the 3 or more candidates whose names are common to both parties' lists of candidates for purposes of determining (a) whether there are any disqualifying conflicts based on the factors set forth in AAA Rule 19(a); and (b) whether a candidate is available and willing to serve as neutral arbitrator. A good faith assertion by either party that a candidate for neutral arbitrator has a disqualifying conflict under AAA Rule 19(a) will result in that candidate's disqualification to serve as neutral. Names of candidates who have disqualifying conflicts or who are unavailable or unwilling to serve will be removed from the list of candidates.

5.    If only one commonly designated candidate is on the list following the interview process, that candidate will serve as the neutral arbitrator. If more than one commonly designated candidate is on the list, the parties, through their party appointed arbitrators, shall attempt to agree upon the neutral arbitrator from the common names on the list, after applying the procedures in step number 4. If unable to agree, the parties shall proceed to step number 6.

6.    If the parties are unable to agree on a neutral arbitrator as provided in step number 5, each party will rank order the remaining commonly designated candidates on the list following the interview process, assigning the number "1" to its preferred candidate, the number "2" to its second choice, and so on for all candidates on the list. The numerical values o f the two parties' rankings for each candidate will be added together, and the candidate with the lowest total number will be selected as the neutral arbitrator. If two or more candidates both have the same lowest total number, the neutral arbitrator will be selected randomly from the two or more candidates with the lowest total number.

7.  If the parties have not succeeded in identifying a party-appointed arbitrator through the foregoing procedures in a period of 45 days, they will ask the AAA to appoint a neutral arbitrator from the AAA's National Panel of Commercial Arbitrators.  The parties shall bear equally the expenses owed to the AAA for purpose of appointment of the neutral arbitrator.

8.  Upon appointment of the neutral arbitrator, the parties shall cease all *ex parte* communications with any arbitrator, including the party-appointed arbitrators.

2

**ATTACHMENT B**

**ETHICAL CONSIDERATIONS RELATING TO
ARBITRATORS APPOINTED BY ONE PARTY**

*Introductory Note*

In some types of arbitration in which there are three arbitrators, it is customary for each party, acting alone, to appoint one arbitrator. The third arbitrator is then appointed by agreement either of the parties or of the two arbitrators, or, failing such agreement, by an independent institution or individual. In some of these types of arbitration, all three arbitrators are customarily considered to be neutral and are expected to observe the same standards of ethical conduct. However, there are also many types of tripartite arbitration in which it has been the practice that the two arbitrators appointed by the parties are not considered to be neutral and are expected to observe many--but not all--of the same ethical standards as the neutral third arbitrator. For the purposes of this code, an arbitrator appointed by one party who is not expected to observe all of the same standards as the third arbitrator is called a "nonneutral arbitrator." In this arbitration, the party-appointed arbitrators will be considered "nonneutral." This statement describes the ethical obligations that the nonneutral party-appointed arbitrators should observe. It is a modification of Canon VII of the AAA Code of Ethics for Arbitrators in Commercial Disputes.

A.    Obligations Under AAA Canon I

Nonneutral party-appointed arbitrators should observe all of the obligations of AAA Canon I to uphold the integrity and fairness of the arbitration process, subject only to the following provisions.

    (1)    Nonneutral arbitrators may be predisposed toward the party who appointed them but in all other respects are obligated to act in good faith and with integrity and fairness. For example, nonneutral arbitrators should not engage in delaying tactics or harassment of any party or witness and should not knowingly make untrue or misleading statements to the other arbitrators.

    (2)    With respect to nonneutral arbitrators, the provisions of AAA Canon I.D relating to relationships and interests will be modified and replaced by the following provision: I.D. Except for receiving compensation as arbitrator, after accepting the appointment and while serving as a nonneutral arbitrator, a person should avoid knowingly entering into any financial, business, or professional relationship or acquiring any financial relationships with the party who appointed them or the lawyers who represent that party. If a party-appointed arbitrator has a financial, business or professional relationship with a witness who testifies on behalf o f a party, the existence of that relationship will not be a basis for disqualifying the party-appointed arbitrator. However, the existence of that relationship will be disclosed to the other arbitrators and the parties.

B.    Obligations under AAA Canon II

Nonneutral party-appointed arbitrators should disclose to all parties, and to the other arbitrators, all interests and relationships which AAA Canon II requires be disclosed. Disclosure as required by AAA Canon II is for the benefit not only of the party who appointed the nonneutral arbitrator, but also for the benefit of the other parties and arbitrators so that they may know of any bias which may exist or appear to exist. However, this obligation is subject to the following provisions.

 (1) Disclosure by nonneutral arbitrators should be sufficient to describe the general nature and scope of any interest or relationship, but need not include as detailed information as is expected from persons appointed as neutral arbitrators.

 (2) Unless they have a direct financial conflict of interest, nonneutral arbitrators are not obliged to withdraw if requested to do so by the party who did not appoint them, notwithstanding the provisions of Canon II.E.

C.    Obligations under AAA Canon III

Nonneutral party-appointed arbitrators should observe all of the obligations of AAA Canon III concerning communications with the parties, subject only to the following provisions.

 (1) In an arbitration in which the two party-appointed arbitrators are expected to appoint the third arbitrator, nonneutral arbitrators may consult with the party who appointed them concerning the acceptability of persons under consideration for appointment as the third arbitrator.

 (2) Nonneutral arbitrators may communicate with the party who appointed them concerning any other aspect of the case, until the third arbitrator is appointed. The content of such communication shall not be disclosed to the other arbitrators or other party. As soon as the third arbitrator is appointed, all ex parte communications between a nonneutral arbitrator and the party who appointed him or her shall cease.

 (3) If nonneutral arbitrators communicate in writing with the party who appointed them concerning this case prior to the appointment of the third arbitrator, they are not required to send copies of any such written communication to any other party or arbitrator.

D.    Obligations Under AAA Canon IV

Nonneutral party-appointed arbitrators should observe all of the obligations of AAA Canon IV to conduct the proceedings fairly and diligently.

E.    Obligations Under AAA Canon V

Nonneutral party-appointed arbitrators should observe all of the obligations of AAA Canon V concerning making decisions, subject only to the following provision.

(1)    Nonneutral arbitrators are permitted to be predisposed toward deciding in favor of the party who appointed them.

F.    Obligations Under AAA Canon VI

Nonneutral party-appointed arbitrators should observe all of the obligations of AAA Canon VI to be faithful to the relationship of trust inherent in the office of arbitrator, subject only to the following provision.

(1)    Nonneutral arbitrators are not subject to the provisions of AAA Canon VI.D with respect to any payments by the party who appointed them. The party who appointed a nonneutral arbitrator will pay that arbitrator directly until the third arbitrator is appointed. As soon as the third arbitrator is appointed, each party shall pay 50% of the total payments due to the three arbitrators.

IN THE MATTER OF THE
ARBITRATION PROCEEDING BETWEEN

ALSTOM Power, Inc.,                  )
      *Claimant*                   )
                      )
                      )
     -v.-                          )
                      )
BDP INTERNATIONAL, INC.,             )
      *Respondent.*               )

## STIPULATION AMENDING THE AGREEMENT
## CONCERNING ARBITRATION PROCEDURES BY AND
## BETWEEN ALSTOM POWER, INC. AND BDP INTERNATIONAL, INC.

The parties, by and through their undersigned counsel, hereby agree and stipulate to amend paragraph 11 of the Agreement Concerning Arbitration Procedures to permit the Arbitration Panel until December 31, 2003 to provide the parties with its arbitration decision.

THOMPSON HINE LLP                PEPPER HAMILTON LLP

BY: *Karyn A. Booth / ACY*        BY: _____
     Nicholas J. DiMichael            A. Christopher Young
     Karyn A. Booth                  3000 Two Logan Square
     Michael H. Higgins             18th & Arch Streets
     1920 N Street, N.W.             Philadelphia, PA 19103-2799
     Washington, D.C. 20036-1600

     Attorneys for Claimant,          Attorneys for Respondent,
     ALSTOM Power, Inc.             BDP International, Inc.

Dated:  December 12, 2003.

**Exhibit C**

**IN THE MATTER OF THE**
**ARBITRATION BETWEEN**

|  |  |
|---|---|
| ALSTOM Power, Inc., | ) |
| *Claimant* | ) |
|  | ) |
| -v.- | ) |
|  | ) |
| BDP INTERNATIONAL, INC., | ) |
| *Respondent.* | ) |

**STATEMENT OF ISSUES AGREED UPON BY THE PARTIES**
**AND SCHEDULE FOR THE ARBITRATION PROCEEDING**

Pursuant to the Agreement Concerning Arbitration Procedures, entered into by and between ALSTOM Power, Inc. ("ALSTOM") and BDP International, Inc., ("BDP") (collectively "the Parties"), counsel for ALSTOM and BDP conferred by telephone for the purpose of resolving certain procedural matters related to the Arbitration Proceeding between the Parties and establishing a proposed procedural schedule for the proceeding. By and through this Statement of Issues Agreed Upon by the Parties and Schedule for the Arbitration Proceeding ("Statement of Issues"), ALSTOM and BDP, by and through their respective counsel, hereby submit to the Arbitration Panel the following report describing the agreements reached by the Parties and containing the proposed procedural schedule for consideration by the Panel:

1.    The Parties have agreed upon a schedule for the conduct of the Arbitration Proceeding, which schedule sets forth dates and/or deadlines for discovery, expert reports, dispositive motions, pre-hearing matters, the hearing, and post-hearing briefs, and matters

included therein. The schedule to which the Parties have agreed and are proposing to the Panel is contained in Exhibit A to this Statement of Issues.

2.    The Parties have agreed upon the following additional matters:

(a)    that any limitations on the scope or amount of discovery shall be determined by the Arbitration Panel;

(b)    that they shall coordinate depositions and other discovery that must be conducted in Indonesia;

(c)    that they shall coordinate the translation of documents for the arbitration and share in the expenses so incurred;

(d)    that the Chair of the Arbitration Panel shall have the authority to rule upon all discovery motions; and

(e)    that the location of the hearing shall be the law offices of Willkie, Farr & Gallagher, at 787 Seventh Avenue, New York, NY 10019-6099.

WHEREFORE, the Parties request that the Panel adopt the agreements and schedule agreed to by the Parties as set forth in this Statement of Issues Agreed Upon by the Parties and Schedule for the Arbitration Proceeding.

Respectfully submitted,

Nicholas J. DiMichael, Esq.
Karyn A. Booth, Esq.
Michael H. Higgins, Esq.
THOMPSON HINE, LLP
1920 N Street, N.W. Suite 800
Washington, D.C. 20036
(202) 331-8800 (telephone)
(202) 331-8330 (fax)

*Counsel for ALSTOM Power, Inc.*

A. Christopher Young, Esq.
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103
(215) 981-4000 (telephone)
(215) 981-4750 (fax)

*Counsel for BDP International, Inc.*

July 15, 2002

So Ordered,

Edward D. Greenberg, Esq.
Galland, Kharasch, Greenberg,
Fellman & Swirsky, P.C.
Canal Square
1054 Thirty-first St., N.W.
Washington, D.C. 20007-4492

Louis A. Craco, Esq.
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019-6099

Leo G. Kailas, Esq.
Reitler Brown LLP
800 Third Avenue
New York, NY 10022-7604

**EXHIBIT A**

**SCHEDULE FOR THE ARBITRATION PROCEEDING
BETWEEN ALSTOM POWER, INC. AND BDP INTERNATIONAL INC.**

| EVENT | DATE/DEADLINE |
|---|---|
| **Discovery:**<br>• Exchange of Initial Disclosures as Required under Fed. R. Civ. P. 26(a)(1)<br><br>• Close of Discovery | August 19, 2002<br><br>January 20, 2003 |
| **Expert Reports (if any):**<br>• Expert Reports<br><br>• Rebuttals to Expert Reports | January 20, 2003<br><br>February 19, 2003 |
| **Dispositive Motions (if any):**<br>• Motions for Summary Judgment<br><br>• Oppositions to Motions for Summary Judgment | January 31, 2003<br><br>February 28, 2003 |
| **Pre-Hearing Items:**<br>• Identification of Fact Witnesses<br><br>• Submission of Pre-Hearing Briefs (Outline of Legal and Factual Issues)<br><br>• Submission and Exchange of Hearing Exhibits | March 20, 2003<br><br>March 20, 2003<br><br>March 24, 2003 |
| **Hearing:**<br>• Arbitration Hearing | April 15, 2003 |
| **Post-Hearing Briefs:**<br>• Post-Hearing Briefs<br><br>• Reply Briefs | May 6, 2003<br><br>May 20, 2003 |

**Exhibit D**

Jan 05 04 11:47a   lol   craco   516-   1011   p.2
(631) 2   255

Dec 29 03 12:05p

## IN THE MATTER OF THE
## ARBITRATION PROCEEDING BETWEEN

ALSTOM Power, Inc.,                    )
                                       )
            Claimant,                  )
                                       )
         -v.-                          )
                                       )
BDP INTERNATIONAL, INC.,               )
                                       )
            Respondent.                )
                                       )

## AWARD OF ARBITRATORS
## AND STATEMENT OF REASONS

I.

Claimant, Alstom Power, Inc. ("Alstom") brings this arbitration proceeding to recover $700,000 from Respondent BDP International, Inc ("BDP") for allegedly mishandling a revenue tax payment to Indonesian customs authorities in such a way as to cause Alstom damages in that amount. BDP denies responsibility for the events giving rise to the loss claimed, and also challenges whether Alstom sustained any legally cognizable damages at all as a result of the transaction at issue.

The dispute has been submitted to arbitration pursuant to the arbitration clause of their Preferred Supplier Agreement (June 3, 1998) as amended and supplemented by their Agreement Concerning Arbitration Procedures (March 25, 2002) ("Arbitration Agreement"). The Parties agree that the Arbitral Tribunal has been properly constituted pursuant to the Arbitration Agreement and that it has jurisdiction over the dispute.

Both Parties have presented extensive submissions of law and fact; evidentiary hearings have been held; and post-hearing briefs have been received. The Tribunal has carefully

considered all these submissions and makes its determinations based on its view of the whole record, the credibility of the witnesses, and the applicable law.

Based on this consideration, and for the reasons summarized below, the Tribunal concludes that Alstom has not sustained its burden of proving by a preponderance of the evidence that BDP was responsible for any loss it may have sustained in the transaction at issue. Accordingly, the Tribunal makes the Award set forth at the end of this Statement, in favor of Respondent denying Alstom's claims in their entirety.

II.

In connection with "Phase II" of this construction in Paiton, Indonesia of a coal-fired thermal power station for Jawa Power by a consortium of which Alstom was a member, Alstom contracted in 1995 to provide two boilers and certain project management and engineering services to Jawa Power. The physical materials necessary for the construction of the project were to be imported into Indonesia on a schedule spread over four years, while the management and engineering services were to be, and in fact were, performed at Alstom's Connecticut offices.

As part of the administration of the 1995 contract, a Master List of all the equipment and material to be imported into Indonesia was created by Alstom and filed with the Indonesian government. For the most part, the items on the list were exempt from duty and other taxes usually imposed by Indonesia on imports. The Master List was scheduled to expire on September 26, 1999, after which significant tax liabilities for imports would apply.

Early in 1999, Jawa Power developed a concern that the contract line item for project management and engineering services, amounting to $28,028,000 might be deemed subject to substantial VAT liability, unless some form of record existed that the services had

-2-

actually been performed in the United States. To establish that the services were not liable to VAT, Jawa Power and Alstom devised a plan to import into Indonesia a set of technical drawings evidencing those services and to impute to the drawings (which themselves were worth around $500) the entire $28,028,000 value of the services themselves. Because one of the exemptions from import tax had expired at the end of 1998, Jawa Power and Alstom recognized that a revenue tax of 2.5% would be due on the shipment, amounting to $700,700. Alstom agreed to pay that tax subject to reimbursement by Jawa Power upon proper proof of such payment.

## III.

Alstom had engaged BDP to act as its freight forwarder for Paiton Phase II. We accept for purposes of our analysis that the terms of their relationship were substantially those found in the Preferred Supplier Agreement for Project Freight Forwarding Services (June 3, 1998) ("PSA"). Under the PSA, BDP was responsible for arranging the carriage of goods to Indonesia, export documentation, customs clearance, and the delivery of the goods to the construction site. To perform the Indonesian end of its responsibilities, BDP engaged a local concern, P.T.Pen, a licensed customs house broker in Indonesia, which had in the past served as a general agent for BDP under an agency agreement. For four years, P.T.Pen routinely performed its duties with respect to the shipments made under Master List. Because the project, and the goods imported for it were largely tax and duty-free, P.T.Pen's involvement in customs clearance, as a practical matter had normally not included tax payments to the Indonesian customs authorities. On a few occasions when a tax was due, P.T.Pen did handle the payment, acting under instructions from and in concert with an Alstom subsidiary. BDP does not appear to have been involved in these payments, and P.T.Pen's invoices for these services went to Alstom's subsidiary, not to BDP.

-3-

IV.

It took several months to devise and implement the plan to import drawings with an imputed value of over $28 million as a solution to Jawa Power's VAT risk on the services for which the drawings were a surrogate. By the time the drawings and other arrangements were ready, the expiration of the Master List, and the consequent higher revenue and import tax exposure were imminent.

Alstom turned to BDP on September 17, 1999 to organize and expedite the air freight shipment of the plans to Indonesia. BDP agreed and set about performing its regular freight-forwarding duties to handle the shipment. On the same day, Alstom also explained to Ken Brown, BDP's on-site coordinator at Alstom's Connecticut offices, the structure and purpose of the imputed value plan, and the required revenue tax payment of $700,700. Alstom asked BDP to handle the financial aspects of the shipment as well. Brown brought the request to BDP's Luc VanHeygen. What happened next triggered this dispute.

Still on September 17, VanHeygen and Alstom's Transportation Manager, Scotton, spoke by phone. Both participants agree that VanHeygen refused to handle the financial aspects of the shipment, citing the risks of such a large currency transfer to Indonesia in light of its unreliable banking system and local corruption. Later the same day, Scotton and another Alstom official told VanHeygen that Alstom would arrange for the $700,700 to be transferred to Indonesia and that it would organize through its consortium partner, Siemens, or through a local subsidiary, the remittance of that sum in Indonesia.

A series of emails ensued in which VanHeygen indicated to P.T.Pen's Taslim BDP's disclination to take part in the financial aspects of the transaction. In doing so, he rebuffed a suggestion from Taslim that BDP should take advantage of an opportunity to profit on the

-4-

difference between the market value of the Rupiahs that the dollars received from the United States would buy and the lower amount of Rupiahs that the customs officials would accept as remittance of the revenue tax because they used an exchange rate lower than market. This arbitrage opportunity obviously contemplated BDP's handling the payment to customs as well as the international funds transfer. VanHeygen responded by saying BDP "would rather not be involved" and that he had so advised Scotton that morning.

Alstom, P.T.Pen, and to a lesser degree, BDP continued to communicate about the progress of the shipment and the money transfer in the face of the looming Master List deadline. In the end, Alstom's subsidiary PT ESI wired $700,700 to P.T.Pen's bank account on September 22, 1999. An Alstom manager directed an Alstom employee "to ensure that there was no deviation" by Taslim in making the remittance, and on September 24 she reported to her Alstom superior that the payment had been duly made. BDP was involved in none of this last-minute supervision of the payment.

On September 22, P.T.Pen in fact made payment by cash and blank check to a customs official, claimed the imputed $28,028,000 value, received an import permit, cleared the shipment through customs and delivered the drawings to their destination.

In a series of subsequent events the exact character of which we find it unnecessary to decide, it developed that $700,000 of the funds remitted on September 22, 1999 disappeared. After a subsequent audit by Indonesian revenue officials, it was determined that the $700,000 revenue tax had not been regularly paid, that Jawa Power was not entitled to a credit it claimed for that amount and that new documents reflecting a 1999 remittance of only $700 were to be issued in lieu of the earlier documents reflecting the larger amount. Jawa Power then deducted from a payment due to Alstom on an unrelated invoice the $700,000 it had previously

-5-

paid Alstom in accordance with its reimbursement arrangement. It is for this chargeback that Alstom brings this case against BDP, asserting that it is liable as principal because, in his mishandling of the ultimate remittance to Indonesian customs so as to enable its misappropriation, Taslim of P.T.Pen had acted as BDP's agent. On the whole of the evidence before us we are unable to conclude that Alstom has proved this key assertion.

V.

As we view the matter, the key issue in the case is whether P.T.Pen's wide-ranging authority to act for and bind BDP on Paiton II matters survived VanHeygen's communications of September 17 and the subsequent conduct of the parties, so as to extend to the actual process of paying Indonesian customs. New York law which governs this dispute (Arbitration Agreement, Par. 12) provides the analytical framework for answering this question.

First, we note that after the VanHeygen telephone calls of September 17, Alstom and its key employees on the ground in Indonesia dealt directly with Taslim in arranging the money transfer and in ensuring that there was no "deviation" by him in carrying out the plan. In so acting with the putative agent, Alstom, under New York law, acted "at its peril." Ford v. Unity Hospital, 32 N.Y.2d 464, 472 (1973) The burden is on Alstom to establish the authority of the putative agent and to show that it made any necessary effort to discover the actual scope of that authority. Ibid.; Legal Aid Soc'y v. Economic Opportunity Council, 132 A.D.2d 113, 115 (3d Dept. 1987); Sponge Rubber Prod. Co. v. Purified Down Prod. Corp., 281 App Div. 380, 382 (1st Dept. 1953). Here, BDP's responsible officer had communicated twice to Alstom's managers that BDP did not wish to be involved in the financial aspects of the transaction. He similarly notified Taslim and declined to pursue the profit opportunity that involvement in those aspects would have afforded to BDP.

-6-

Alstom responds that VanHeygen did not explicitly say in any of these communications that BDP would not deliver the revenue tax payment to the Indonesian customs authorities as part of its general customs clearance responsibilities. In this view, he balked only at fronting the funds for the tax or taking responsibility for their transfer to an Indonesian bank, but not from having BDP's general agent receive the funds and make the tax payment if the funds were advanced and safely transferred to the country by someone else.

We think this is an improbable, though not impossible, understanding of what VanHeygen said and meant. We think it is improbable because the currency play he declined involved the tax payment as well as the fund transfer, and because the concerns he expressed also applied to both financial aspects of the shipment. Presented, in a fluid situation, on an emergency basis, with what he—correctly, as it turned out—perceived as a large financial risk, he declined to assume it, without differentiating among the various transactional steps that might have exposed BDP to that risk. He cited, according to the evidence we credit, reasons of structural unreliability and indigenous corruption that were as applicable in theory-and, as it turned out, in fact-at the customs house as at a local bank. Put slightly differently, Alstom's parsing of what VanHeygen said is not the only, necessary understanding of the position he expressed, and there is no evidence that Alstom took any steps at the time it was dealing directly with Taslim to discovery whether the meaning it now ascribes to those conversations was correct. Rather than try to clarify what VanHeygen meant, or persuade him to change his mind, Alstom avoided further contact with him on the matter and dealt with Taslim directly. This course of conduct did not meet the standard of the cases requiring Alstom to "make the necessary effort to discover the actual scope of authority" of P.T.Pen.

-7-

New York law likewise imposes a duty of inquiry upon a third party when the transaction in which it seeks to hold the principal liable on account of the acts of a putative agent is extraordinary or novel, or where the circumstances are such as to put the party on inquiry. See, e.g., FDIC v. Providence College, 115F.3d 136, 141 (2d Cir. 1997); Herbert Constr. Co v. Continental Ins. Co., 931 F.2d 898, 995-96 (2d Cir. 1991) (both applying New York law), and cases cited therein. When, as here, the issue of apparent authority is raised, the burden of proving that the transaction was not novel or extraordinary, and that no circumstances existed warranting inquiry, rests on the reliant third party. FDIC, supra, at 142; Herbert, supra, at 993-94. The law views this as an aspect of the necessary proof that the claimant's reliance on the agent's apparent authority was reasonable. Ibid.

Alstom has not made any serious effort to sustain its burden of showing that this transaction was not what it obviously was: novel and extraordinary. While its unusually large size by itself is not enough to meet the standard (See, Oriental Commercial and Shipping v. Rosseel, 702 F.Supp. 1005, 1016[SDNY 1988]), the enormous value ascribed to the shipment compared to its tangible worth, its admittedly artificial, tax-driven structure, its rushed implementation, VanHeygen's negativity (however expressed), all were red flags that Alstom was obliged to heed at its peril. Where, as here, the required inquiry about the scope of the agent's authority is not made, the principal cannot be held to damages under New York law. See, Angerosa v. White, 248 App. Div. 425, 432 (4th Dept. 1936); VanArsdale v. Metropolitan Title Guaranty Co., 103 Misc. 104, 107 (Nassau Dist. Ct. 1980); see also, William Penn Life Ins. Co v. Irving Trust Co., 145 A.D.2d 174, 178 (1st Dept. 1989) (dicta).

The same result would ensue if the case were analyzed under the law governing the withdrawal of P.T.Pen's prior authority to deal with customs clearance matters. To the extent

-8-

such a revocation is expressed by a principal to a third party, as VanHeygen did here to Scotton, it is the third party's duty to clarify any ambiguity in the terms or extent of that revocation. And the third party is deemed to know what it would have learned by such inquiry. See, Restatement of Agency (Second), sections 118, 119, 135 (comment c), 44 (comment c), 9 (comments c and c). To the extent Alstom's managers were in any contemporaneous doubt about BDP's entire withdrawal from all financial aspects of the shipment, there is no evidence of their making any effort to clarify the situation.

VI.

In summary, we conclude that Alstom had the burden in this case of establishing by a preponderance of the evidence that P.T.Pen, in handling the tax remittance at the customs house acted as BDP's agent. In the circumstances revealed by the record, and in view of the exacting duty of inquiry imposed by New York law in such circumstances, we are unable to conclude that Alstom has satisfied its burden.

This conclusion makes it unnecessary to consider BDP's further contention that the $700,000 loss claimed was not, as a matter of law and fact, causally connected to Taslim's conduct even if he were BDP's agent.

Likewise, we have no occasion to address in the award any allocation of costs or expenses of these proceedings, since the Parties have disposed of these matters in the Arbitration Agreement, Par. 6.

Although it is perhaps not customary to do so, the Arbitral Tribunal wishes to note the excellence of preparation and presentation of the case by counsel for both parties, and their helpful cooperation with each other and with the Tribunal which is grateful for the quality of this assistance.

-9-

By reason of the foregoing, the Arbitral Tribunal makes the following Award:

AWARD

The Arbitral Tribunal, having been duly constituted, having heard and considered the evidence and arguments submitted by the Claimant and by the Respondent herein, and having duly deliberated thereon, hereby awards as follows:

1.  The claims of the Claimant, Alstom Power, Inc. should be and the same hereby are denied.

2.  This Award is in full and complete settlement of any and all claims or other matters properly submitted to this Arbitration. All claims, contentions or other matters not otherwise expressly addressed in this Award are denied.

Rendered at New York, N.Y.
as of December 31, 2003

12/29/03
Date

Louis A. Craco
Chair

_____
Date

_____
Edward D. Greenberg
Arbitrator

_____
Date

_____
Leo G. Kailas
Arbitrator

-10-

By reason of the foregoing, the Arbitral Tribunal makes the following Award:

## AWARD

The Arbitral Tribunal, having been duly constituted, having heard and considered the evidence and arguments submitted by the Claimant and by the Respondent herein, and having duly deliberated thereon, hereby awards as follows:

1.    The claims of the Claimant, Alstom Power, Inc. should be and the same hereby are denied.

2.    This Award is in full and complete settlement of any and all claims or other matters properly submitted to this Arbitration. All claims, contentions or other matters not otherwise expressly addressed in this Award are denied.

Rendered at New York, N.Y.
as of December 31, 2003

_12/29/03_
Date

_Louis A. Craco_
Chair

_____
Date

_____
Edward D. Greenberg
Arbitrator

_12 | 29 | 03_
Date

_____
Leo G. Kailas
Arbitrator

-10-

By reason of the foregoing, the Arbitral Tribunal makes the following Award:

## AWARD

The Arbitral Tribunal, having been duly constituted, having heard and considered the evidence and arguments submitted by the Claimant and by the Respondent herein, and having duly deliberated thereon, hereby awards as follows:

1.    The claims of the Claimant, Alstom Power, Inc. should be and the same hereby are denied.

2.    This Award is in full and complete settlement of any and all claims or other matters properly submitted to this Arbitration. All claims, contentions or other matters not otherwise expressly addressed in this Award are denied.

Rendered at New York, N.Y.
as of December 31, 2003

12/29/03
Date

Louis A. Craco
Chair

12/31/03
Date

Edward D. Greenberg
Arbitrator

Date

Leo G. Kailas
Arbitrator

-10-